### SANTIAGO et al. v. ROSES et al.

(Circuit Court of Appeals, First Circuit. May 8, 1917.)

No. 1226.

1. COURTS ☞489(13)—FEDERAL COURTS—JURISDICTION—ADMINISTRATION OF ESTATES.

In a suit to have a mortgage and proceedings for its foreclosure declared void, and to have plaintiffs declared the only heirs at law of the mortgagors, the federal District Court for Porto Rico has no jurisdiction to make such declaration respecting plaintiffs' heirship, as no federal court has original jurisdiction of the administration of estates of deceased persons.

2. MORTGAGES ☞86(3)—VALIDITY—SUFFICIENCY OF EVIDENCE.

In a suit to have a mortgage executed by a person acting under a power of attorney declared void, evidence *held* insufficient to charge the mortgagees with fraud in procuring the execution of the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 197, 1364.]

3. MORTGAGES ☞319(3)—PAYMENT—SUFFICIENCY OF EVIDENCE.

In a suit to have a mortgage and proceedings for its foreclosure declared void, evidence *held* insufficient to show that the mortgage debt was completely satisfied and paid, or that a receipt in full and cancellation of the mortgage were demanded and refused on false and fraudulent pretexts.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 863, 875, 915. 1366.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. JUDGMENT ⚖461(4)—SETTING ASIDE—EVIDENCE—NOTICE.
Evidence *held* insufficient to show that the mortgagors had no notice of the foreclosure proceedings.
[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 895.]

5. JUDGMENT ⚖957—EVIDENCE TO IMPEACH JUDGMENT—OVERCOMING PRE-SUMPTION OF REGULARITY.
Where the record of the proceedings to foreclose a mortgage in a Porto Rican court recited that the mortgagors had interposed no objection, and that one of the mortgagors was himself appointed trustee of the land, and contained a petition, purporting to have been filed on behalf of the mortgagors, reciting that they had no opposition to offer, and naming an appraiser whose appointment they requested, clear and convincing proof was necessary more than 20 years after the proceedings to overcome the presumption in favor of their regularity.
[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1826.]

6. LIMITATION OF ACTIONS ⚖19(1)—LIMITATION APPLICABLE—REAL ACTIONS.
Civ. Code Porto Rico, § 1864, providing that real actions with regard to real property prescribe after 30 years, applies only when want of good faith appears on the defendant's part, in view of section 1858, providing that ownership and other property rights in real property shall prescribe by possession for 10 years as to persons present and 20 years with regard to those absent with good faith and with a proper title.
[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 73, 80, 84, 85.]

7. PRINCIPAL AND AGENT ⚖43(3)—REVOCATION OF AUTHORITY—DEATH OF PRINCIPAL.
Where an objection to the validity of a mortgage executed by a person acting under a power of attorney, on the ground that one of the mortgagors had died a few days before the mortgage was executed, was never raised or suggested until 22 years later, more than 15 years after the termination of the foreclosure proceedings, and over a year after the only surviving child of such mortgagor attained majority, and in the fore-closure proceedings, a petition by the mortgagors, reciting that they had no opposition to offer was signed by her father as her legal representative, and it did not appear that he was not her legal representative, the mort-gage could not be avoided by mere proof of her mother's death before the mortgage was executed, without evidence charging the agent or the mortgagees with knowledge thereof, in view of Civ. Code Porto Rico, § 1640, providing that what has been done by the agent when he was not aware of the death of the principal shall be valid and of effect with regard to third persons, who may have contracted with him in good faith.
[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 71.]

Appeal from the District Court of the United States for the District of Porto Rico; Peter J. Hamilton, Judge.

Suit by Maria Leonor Santiago y Muniz and others against Miguel Roses y Artau and others. From a decree dismissing the bill, complainants appeal. Affirmed.

Perry Allen, of New York City (Henry G. Molina, of San Juan, Porto Rico, on the brief), for appellants.

Howard Thayer Kingsbury, of New York City (Frederic R. Coudert, of New York City, on the brief), for appellees.

Before DODGE and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DODGE, Circuit Judge. By this bill in equity, filed May 13, 1913, the appellants (hereinafter called plaintiffs) attack the validity of proceedings completed in 1898, to foreclose a mortgage dated April 11, 1891.

The mortgage purports to have been given by six persons in all, as owners of the mortgaged property. Two of said persons, living when the bill was filed, are plaintiffs in this suit. The remaining plaintiffs, eight in number, allege themselves to be the heirs at law of one or another of the four other mortgagors, deceased prior to the filing of the bill.

The mortgagees were the persons then composing the firm of Roses & Co., of Arecibo, Porto Rico, to which firm the mortgage purports to be given. The bill alleges that said firm, having entered into possession of the mortgaged property in 1901, continued in possession until 1909, and in that year dissolved and divided its property, allotting the mortgaged property here in question to three of the defendants named in the bill, then members of said firm, who have since continued in possession thereof.

The bill alleges all of the ten plaintiffs named to be citizens and residents of Porto Rico. It names fifteen persons in all as defendants, and alleges that they are all the partners of said firm and of its successor, a firm which in 1899 is alleged to have taken over all the assets and assumed all the liabilities of the original firm, thereafter continuing its business until its dissolution in 1909. Of the three defendants alleged to be in possession of the property, one, according to the bill, is a citizen of the United States and a resident of Porto Rico; the other two are Spanish subjects and reside in Spain. All the remaining twelve defendants are Spanish subjects, according to the bill, and all but two of them, who reside in Porto Rico, reside in Spain, according to the bill. None of said twelve defendants are alleged to be now in possession of the property.

The mortgage was executed on behalf of the mortgagors named in it by one Delgado as their attorney in fact. It purported to secure the payment of 2,550 pesos, with interest at 12 per cent., on or before March 25, 1892. The bill alleges that one of the mortgagors named had in fact died on April 7, 1891, four days before the date of the mortgage.

The bill further alleges that Roses & Co. fraudulently induced the mortgagors to execute the mortgage. It does not deny Delgado's authority to execute the mortgage, except so far as the above allegation that one of their number had died amounts to such denial. It does not allege that the debt purported to be secured by the mortgage was not in fact owing by the mortgagors named to the mortgagees, though it refers to said debt as one which "the said firm alleged to be owed it by Antonio Santiago y Heredia," the husband of one and father or grandfather of the other mortgagors named, who appears to have died some months before the execution of the mortgage, in January, 1891, or earlier.

The bill goes on to allege that during 1892 the mortgagors paid the mortgage debt in full and requested cancellation of the mortgage, and that Roses & Co. "for various false and fraudulent pretexts" failed

to cancel it, and on the contrary proceeded to foreclose it by proceedings begun in the court of first instance, in Arecibo, in April, 1892, wherein Roses & Co. were adjudged owners of the property in October, 1897. Of these proceedings, according to the bill, no sufficient notice was given, and they were falsely and fraudulently pursued by Roses & Co. for the purpose of unlawfully depriving the plaintiffs of their property.

The bill prays (1) that the plaintiffs be declared "the only heirs at law" of the respective mortgagors; (2) that the mortgage be declared void so far as it purports to convey the interest of the mortgagor alleged to have died before its execution; and (3) also void as to all the plaintiffs, and that it and the record thereof be canceled; (4) or in the alternative, for repayment of the amount paid in satisfaction of the mortgage debt; (5) that the foreclosure proceedings be declared void; (6) that the plaintiffs be declared owners of the property and its present possessors ordered to vacate it; (7) for an accounting of rent and profits since Roses & Co. took possession; and (8) for payment to the plaintiffs of the amount thereby ascertained to be due them.

[1] 1. As to the first of the above prayers, the federal District Court for Porto Rico is without jurisdiction to grant it. The terms in which the request is made are as follows:

"That the complainants Perpetua, Maria, and Mariana Diaz y Santiago be declared to be the only heirs at law of Antonia Santiago y Muniz; that the complainant Beatriz Gonzalez y Santiago be declared to be the only heir at law of Saturnina Santiago y Muniz; that the complainants Isidra, Victoria, Maria, and Cipriana Andujar y Santiago be declared to be the only heirs at law of Carmen Santiago y Muniz; and that all the complainants be declared to be the only heirs at law of Antonia Muniz y Galarza."

Declarations of heirship such as the federal District Court is thus asked to make in the case of each of the four mortgagors above named might apparently have been made, upon their respective deaths, and upon proper petition and proof, by the local district court of the last domicile, of the decedent, or of the place where her property was situated, if she left no will or no valid will. The provisions of the Porto Rico Revised Statutes regarding them, in force since March 9, 1905, are sections 1558, 1559, of the Compilation published by the Bureau of Insular Affairs, War Department, in 1913. The alleged dates of death of three of said four mortgagors are subsequent to the enactment of these provisions. The alleged date of death of one (Saturnina) is April 7, 1891, at which time Porto Rico was under Spanish law, which is understood, however, to have had similar provisions upon the subject. No application to any local court for any declaration of heirship in either of the four cases has ever been made, so far as appears.

It is certain that no federal court has original jurisdiction of the administration of estates of deceased persons, such as would be necessary for the purpose of making such declarations of heirship. See Amsterdam v. Puente, 3 P. R. Fed. 447; Aran v. Fritze, Id. 509, 521; Ramos v. Arsuaga, 6 P. R. Fed. 85. Obviously, therefore, no such court has power to make such declarations in a case like this, wherein its jurisdiction depends entirely on diverse citizenship of the opposing parties,

and involves no rights in dispute between them in or to the estates in question.

The bill alleges the death of Antonia, Saturnina, and Carmen Santiago, and of Antonia Muniz, on various dates after the giving of the mortgage and before the bill was filed. It does not allege, as to either of said persons deceased, whether she left a will or not. It alleges their respective surviving children and only heirs at law to be the plaintiffs named in the above quotation from the bill. All these allegations are denied in the answer for want of knowledge or information. Evidence offered by the plaintiffs, which the defendants did not undertake to contradict, tended to prove that the above-named four persons died upon the alleged dates. If it can be said that there is evidence tending to show that Antonia Muniz left no will, there is certainly no evidence tending to show whether the other persons deceased left wills or not, even if the federal District Court could properly undertake to determine whether they died testate or intestate.

As to all the plaintiffs, therefore, except the two survivors of the original mortgagors (Maria Leonor and Florentina Santiago), it may well be true, as the defendants claim, that no rights in them entitling them to maintain such a bill as this have been established. That, under Porto Rican law, rights in or to real estate pass by descent, so as to vest in heirs at law independently of any will or declaration of heirship, is not made clear. The opinion of the District Court suggests this question, but, without passing upon it, determines the case on other grounds. Neither party having satisfied us regarding the actual state of Porto Rican law with reference to the matter, we shall assume, without deciding, that all the plaintiffs, without distinction, may have rights entitling them to maintain such a suit as the present, although no local court has so declared.

[2] 2. All the remaining prayers for relief are based on allegations apparently meant to be understood as charging the defendant firm with fraud, first in the execution of the mortgage, and later in connection with the proceedings to foreclose it. The District Court found none of these charges proved, and it is for the appellants to satisfy us that the evidence required a contrary finding.

As has been stated, there is no attempt to deny that Delgado's power of attorney from the mortgagors, so far as it was concerned, was originally valid, and gave him the authority it purported to give him. The plaintiffs put it in evidence. It was executed before a notary in Utuado, February 25, 1890, more than a year before Delgado executed the mortgage on their behalf, which he did before a notary in Arecibo, April 11, 1891. The power of attorney expressly authorized Delgado, among other things "to constitute, modify, and cancel mortgages and other liens." According to the record, the six persons who gave it "did not sign, because they could not do so, and a witness, Mayol, signed for them." But, even if they had undertaken to deny their due execution of the power, the fact that they were unable to sign it would be of little significance in a country where such papers have to be executed, as this was, before a notary, and to form part of his records.

The only allegations of fraud inducing the execution of the mortgage are in the following terms:

"That the firm Roses y Compania was a very powerful and wealthy business house, doing a very great business in Arecibo and a very large proportion of the business of Utuado, especially the production and exportation of coffee and the furnishing of supplies to the coffee producers, and the complainants were comparatively poor and ignorant people, owning a few pieces of land whereon they produced coffee and other fruits, and from the sale of the former, always to [said firm], and consumption of the latter were able to support themselves and their families. That [said firm], taking advantage of their influential position in the community and of the ignorance of the complainants and their parents, induced them falsely and fraudulently through and by means of said [Delgado], who was in the employ and under the influence of [said firm], to execute the aforesaid mortgage of their own property to secure a debt which the said firm alleged to be owed it by Antonio Santiago y Heredia," etc.

From the mortgage itself, put in evidence by the plaintiffs, it appears that the debt it purported to secure was not a debt claimed by the firm to be due it from Antonio Santiago y Heredia, but a debt claimed to be due it from the plaintiffs themselves as his "successors." It recites that Delgado has—

"arranged this day pursuant to a due liquidation the current account which the said Santiago estate owes to [said firm], to satisfy the same at a certain date, with interest, by means of a mortgage of the described property to respond for the debt and the amounts determined upon for unpaid interest and costs."

Also that Delgado, in the name of his principals, as the "members constituting the estate" of said Antonio—

"recognizes and confesses that the latter are joint debtors of [said firm], in the sum of 2,550 pesos * * * as the balance of a commercial account arranged on this date, and obligates them to satisfy said amount on [March 28, 1892], together with interest," etc., " * * * mortgaging at the same time * * * the property * * * to respond for the payment of said 2,550 pesos, together with 450 pesos for interest and 500 pesos for costs and damages in the event of judicial proceeding."

That the mortgage itself, and not the above allegations in the bill, truly describes the debt it was executed to secure, appears from accounts current on the firm's book. An account with said Antonio begins in 1886, and shows a balance of 5,602.26 pesos due from him at the end of February, 1890. This amount is charged under date of March 1, 1890, against his "succession." Subsequent charges and credits during subsequent months indicate that the "succession" continued to do business with the firm by sending it coffee from time to time, and by obtaining from it cash and merchandise at various times, and that as the result of said transactions the balance in the firm's favor on April 17, 1891, was reduced to only 2,512.08 pesos. Under that date there is credited to the "succession" 2,550 pesos for "the amount of the mortgage obligation which they have constituted in our favor on the 11th inst.," leaving 37.92 pesos to the "succession's" credit in the account as thereafter continued by later charges and credits until the end of 1897. There is no suggestion of any complaint made at the time that the mortgagors were under no indebtedness to the firm.

Nowhere in their bill do the plaintiffs distinctly allege that the debt which the mortgage purported to secure was not in fact owing to the

firm from the mortgagors. The nearest approach to such an allegation is to the effect that—

"the owners aforesaid of the said property, ignoring their rights in the matter and thinking that they were legally bound to satisfy * * * the mortgage debt of 2,550 pesos with interest, * * * did completely satisfy and pay the same in the office of the said firm."

We find nothing in the record amounting to proof that the debt secured was not in fact owing, or that in recognizing it as such and executing the mortgage to secure it Delgado acted "in the employ or under the influence of" the firm, or otherwise than in good faith toward his principals. Two items charged to the "succession" in the account under date of April 7, 1891, for "cash delivered to B. Delgado," amounting to 302 pesos in all, appear to be mainly relied on in support of these charges; but no proof was offered that the 302 pesos were paid to Delgado for other than legitimate purposes, or that the "succession" got no benefit from the payments. The only testimony having anything like direct reference to Delgado's doings in the matter of the mortgage was in substance as follows: Diaz, surviving husband of one mortgagor (Antonia), and father of three of the plaintiffs, said the mortgage did not come to his knowledge until some months after it was given. Florentina, one of the mortgagors, and Andujar, her husband, stated that Delgado obtained the power of attorney for the purposes of a then pending lawsuit wherein the heirs were interested; that Santiago's widow shortly afterward "became very angry, and immediately caused the power of attorney to be withdrawn, because Delgado had constituted without her consent a mortgage in favor of the firm." Andujar stated that he, with two other sons-in-law, went to Delgado, at some time not fixed, who turned over to them the copy of the power of attorney. But Andujar also stated on cross-examination that the widow became "angry," because she claimed that the true amount of the debt to the firm was only 1,300 pesos, which the "succession" could have paid without mortgaging property—a claim which no evidence was offered to support. Martinez, keeper of the records of the Arecibo district court, who said he had known Delgado for 30 years, testified that about the year 1890 Delgado "was engaged in securing lawsuits," he was "what we usually call pettifoggers (pica pleitos)." As all the witnesses testified in person before the District Judge, we cannot hold it reversible error on his part that he declined to find the defendants charged with fraud in procuring the execution of the mortgage, upon allegations like the above, unsupported except by evidence of the above character, given more than 20 years after the events to which it related.

[3] The allegations of fraud practiced after the mortgage had been given are that, although the mortgage debt of 2,550 pesos was completely satisfied and paid, as above, and although the owners of the property—

"thereupon requested from [said firm] a receipt in full for the said amount and the corresponding cancellation of the mortgage, * * * [said firm] for various false and fraudulent pretexts given by it has ever failed to cancel the same, and, on the contrary, have proceeded to foreclose the mortgage as hereafter stated."

The allegations charging fraud in connection with the foreclosure proceedings are that the owners—

"were never notified as to any legal proceedings whatever established by [said firm] against them for the purpose of foreclosing the mortgage heretofore mentioned and completely satisfied and paid as aforesaid; that the aforesaid legal proceedings were falsely and fraudulently pursued on the part of [said firm] with the object of unjustly and illegally depriving the complainants of the property, and that the aforesaid decree of foreclosure and grant to [said firm] * * * is null and void, and should be so adjudged by this court."

As to the above allegations that the firm proceeded to foreclose the mortgage, notwithstanding it had been paid in full, there is no attempt to show that the firm received anything from the mortgagors before the mortgage became due on March 28, 1892, except a shipment of coffee, for the proceeds whereof the "succession" is credited on the firm's books February 17, 1892, for 820.59 pesos, in the same manner that prior like shipments had been credited. To show that this shipment was made on account of the mortgage debt, there is only the testimony of Diaz and Andujar. Neither undertakes to say that it was so understood or accepted by the firm, or that any receipt for it was ever asked or given. Of course, no receipt in full could then have been claimed.

The record of the foreclosure proceedings shows that they were begun by a petition bearing date March 21, 1892, but in the record thereof March 29, 1892, is afterwards recited as the date of their actual beginning. Before anything except the coffee above referred to was received by the firm from the "succession," the foreclosure proceedings had progressed by successive steps in April, June, and July, 1892, to a sale on August 19, 1892, at which sale no bidders appeared, and which was followed, February 22, 1893, by a petition that the mortgaged property be adjudged to the firm at two-thirds its appraised value of 4,000 pesos. The allegations that the mortgagors were without notice of these proceedings are further considered below; but it is now to be noticed that the alleged full payment of the mortgage before foreclosure, rests in addition to the above coffee shipment, upon two payments of 2,000 and 500 pesos, respectively, to the firm, for which its books give credit to the "succession," in the above account, on March 22, 1893, and November 16, 1893, respectively—both made after the mortgaged property had been offered at public sale, as above.

Diaz testified that he made the payment of 2,000 pesos to a representative of the firm in person, and that the money came from one Ramos, to whom the "succession" had sold part of the mortgaged property for 4,200 pesos in March, 1893, with the understanding, according to Andujar and Ramos, that the mortgage should be discharged out of what Ramos paid. But his testimony does not go far enough to prove any understanding with the firm, as to this payment, that it was to be then so applied, and such an understanding can hardly be presumed, in view of the stage to which the foreclosure proceedings had then progressed, as above. A fire in his store, according to his testimony, has since destroyed a receipt then given him.

Ramos testified that the later payment of 500 pesos was made to

the firm by him; but he, like Diaz, fails to show that what he then paid was to be applied in reduction of the mortgage then in process of foreclosure. It is to be noticed that, according to Ramos, the property was treated between him and the "succession," in their dealings of March, 1893, as then subject to a mortgage of 2,500 pesos, without reference to any reduction thereof by the shipment of coffee now claimed to have reduced it in February, 1892, by more than 800 pesos.

As to the allegations that after the mortgage had been fully paid, a receipt in full and cancellation were demanded, but refused by the firm on "various false and fraudulent pretexts," the only evidence relied on in support of them is to the effect that four or five years later, in 1898, after the firm had been for some time in possession of the mortgaged property under final decree in the foreclosure proceedings, Andujar, Diaz, and one, Serrano·went to the firm to find out what Ramos had paid on account of the property; he having demanded the deed thereof from the "succession." They were shown the firm's books, upon which there appeared, then, as now, the above payments credited in the account current. For the status of the mortgaged property the firm referred them to the record of the foreclosure proceedings. We are unable to say that the District Court erred in declining to find these allegations of fraud sufficiently supported by proof.

[4] As to the allegations that the "succession" had no notice of the foreclosure proceedings, the record of said proceedings recites that on April 11, 1892, the mortgaged property was "attached," and Diaz himself appointed "trustee" thereof; an order made therein April 25, 1892, further recites that the mortgagors had interposed no opposition; and a petition therein, dated June 23, 1892, purporting to have been filed on behalf of Antonio Santiago's widow, his then living daughters, and Gonzalez, surviving husband of Saturnina, who had deceased, recites that they had no opposition to offer, and names an appraiser, whose appointment they requested. This petition purports to have been signed at Utuado by Andujar and Diaz, each "for myself and wife," and by Gonzalez. The name of Antonia Muniz is signed by one Echevarria, one Rodrigues signs "by request of Don Vicente Andujar, Jr., and Doña Carmen Santiago," one Quinonez signs "by request of my wife, Maria L. Santiago." The order for sale of the property on August 19, 1892, made July 22, 1892, directed publication of notice in Utuado, where the property was situated and the mortgagors lived.

[5] To overcome the presumption in favor of the regularity of the proceedings, after more than 20 years, in view of what appears from the record thereof, as above, it is obvious that clear and convincing proof was necessary. No one of the surviving mortgagors undertook to testify that they never had notice of the pendency of the proceedings. The only testimony having any tendency whatever to show such want of notice was in substance as follows: Diaz denied that he was appointed trustee in said proceedings in April, 1892, as recited in the record. He asserted that his signature to a certificate which recited his appointment, his acceptance, and that he had been sworn to perform the duties was in fact made for the purposes of a different proceeding. He did not undertake to deny, however, that he signed the petition of June

23, 1892, for the appointment of an appraiser on behalf of himself and wife. Andujar undertook to testify that he knew nothing of this petition and that neither he nor his wife had knowledge of the foreclosure proceedings. According to his testimony, he did not remember signing anything in 1892, and had only learned how to sign within the last three years. We are unable to hold that the District Court erred in declining to find this evidence sufficient to prove that the foreclosure proceedings were in fact carried on without notice to the mortgagors. To prove that they were intentionally so carried on by the firm, with the fraudulent purpose of obtaining a decree without notice, as the bill alleges, we find in the record absolutely no evidence worthy of consideration.

Following its petition of February 22, 1893, that the mortgaged property be adjudged to it, the firm filed another petition November 24, 1893, wherein it recited that, of the 333 cuerdas covered by the mortgage, 50 were claimed by third parties, and consented that they be excluded from the adjudication sought. Alleging that the amount due on the mortgage, with interest and costs, exceeded two-thirds of the appraised value of the property, the petition asks that the firm be put in possession of the remaining 283 cuerdas and that a writ issue for that purpose. The court so ordered November 25, 1893.

No further step in the proceedings was taken, however, until August 14, 1897. By a petition then filed, the firm, of its own accord, so far as appears, represented to the court that prior to the carrying out of the order of November 25, 1893, the "indebted estate had made payment of the greater part of the credit," leaving a balance of 894.95 pesos due, with interest and costs. It asked the court, in view of this, to adjudge to the firm and put it in possession of only "a sufficient number of cuerdas" out of the 283, to cover what so remained due. An order to that effect, made October 7, 1897, recited that the petition "was announced in open court to the defendant estate." On a subsequent petition for the appointment of a surveyor to "make the segregation of the property under the attachment, and fix its metes and bounds," the court made such an appointment, January 20, 1898, following an order for notice to the parties and a recital that the defendant failed to appear. By another order, made the same day, 132.04 cuerdas were adjudicated to the firm out of the 283 referred to in former orders. A subsequent "act of possession" certifies that on March 4, 1898, an officer of the court gave possession in pursuance of said order to a representative of the firm of a parcel of land bounded according to an accompanying report of the designated surveyor. This is the land involved in the present suit. A certificate of the proceedings, reciting that they had been upon due notice, was duly registered in July, 1898.

There is testimony in the record, from Ramos, that he was in occupation of the mortgaged property in March, 1898, would have known i' if possession had been taken as this "act of possession" recites, and that he never saw there the officer or the representative of the firm mentioned in said act. Except as already stated, there was no evidence before the District Court tending to contradict the recitals in

the foreclosure proceedings relating to the steps taken therein in 1897 and 1898. It was argued that 894.95 pesos, with interest and costs, was not in fact due the firm in August, 1897; but we cannot hold that the evidence before the District Court required such a conclusion, against the findings of the local court, as shown by the record of its proceedings at the time. That the firm voluntarily relinquished its claim to more than half the property covered by its mortgage obviously tends to nega-- tive the charge that it was acting oppressively, or carrying out a scheme to defraud the mortgagors. The arguments to that effect in the ap- pellant's brief seem to us based mainly upon epithets and accusations unjustified by any proof to be found in the record.

All the above proceedings, resulting in possession taken by the firm under judicial order, were had while Porto Rico was Spanish terri- tory and under the Spanish law then prevailing therein. After said possession was acquired in 1898, there was no attempt to dispute or disturb it until this suit was brought in May, 1913. Ramos occupied the property under lease from the firm during part of 1900 and 1901, but the evidence regarding the dealings between him and the firm in the matter of this lease has no tendency, so far as we can see, to assist the plaintiff's contentions above considered. The liquidation of the firm's affairs in 1909, whereby the property came into possession of the three defendants above named, took place meanwhile, four years before this suit was begun.

We find no error in the refusal of the District Court to hold the foreclosure proceedings void whether for want of notice or otherwise.

| 6 | 3. The defendants pleaded, in answer to the bill, that the plain- tiffs' cause of action was barred by certain provisions of Porto Rican law; also that by their undisturbed possession since 1898 they had ac- quired a title by prescription, which it was too late to dispute in 1913. Since the plaintiffs' suit was not brought in any local court, nor accord- ing to the forms peculiar to the local laws, there is difficulty in directly applying to it the terms of any section cited from the Civil Code or the Mortgage Law. If the suit is, in substance, an "action for nullity" of a contract, such as is to "last four years," according to section 1268 of the Code, the time for bringing it, of course, expired long before 1913, as remarked in the opinion of the District Court. In Henna et al. v. Sauri et al., 237 Fed. 145, —— C. C. A. ——, before this court in 1916, a suit in the courts of Porto Rico, similar in nature to this, was held by those courts not "prescribed" until after fifteen years had expired—a ruling not appealed from, and according to which, if here applied, the plaintiffs' claims became barred by March, 1913, at the latest. By section 1858 of the Civil Code, the rights of the firm to the property in question would become established by prescription after their possession had continued for ten years, i. e., in 1908; the plain- tiffs being during that entire period all "present" in Porto Rico, so far as appears. The District Court regarded the firm's rights as so established. The plaintiffs invoke section 1864 of the Code, accord- ing to which "real actions" do not prescribe until after thirty years; but, in view of section 1858, this rule is applicable only when want of good faith appears on the defendant's part, which, as above held, can-

not be said in this case. In view of the uncertainty as to the proper application of the local law relating to these questions, we have preferred to examine fully the evidence concerning the plaintiffs' allegations, rather than to dispose of them by any ruling that their right to make them had expired by limitation.

[7] 4. Certain grounds upon which one of the plaintiffs, Beatriz Gonzalez y Santiago, denies the validity of the mortgage as to her, remain to be considered.

Born February 28, 1891, she claims to be the only surviving child of Saturnina, the daughter of Antonio Santiago, whose death occurred, according to the bill, at Utuado, on April 7, 1891, four days before the date of the mortgage executed as above under his power of attorney by Delgado at Arecibo. Of any authority to represent her mother he had been, as she contends, necessarily deprived before the mortgage was executed.

Her objection to the validity of the mortgage, though available ever since its execution, is one never raised or suggested until the present bill was filed 22 years later, 21 years after the foreclosure proceedings began, and more than 15 years after their termination. She attained majority February 28, 1912, more than a year before the bill was filed. Her father, Atanacio Gonzalez, was one of the signers of the petition above mentioned, filed June 23, 1892, in the foreclosure proceedings— "in his capacity," it is therein recited, "as father of the sole and only heir of [her mother], named Beatriz, a minor, and therefore her legal representative." There has been no attempt to deny that he did so sign, or to show that he did not continue to be his daughter's legal representative, throughout her minority.

In view of all the above, we find no error in the conclusions of the District Court, referring to section 1640 of the present Civil Code, identical in terms with article 1738 of the Spanish Civil Code, in force at the time, that the mortgage cannot now be avoided by mere proof of the date of her mother's death, without evidence charging Delgado or the firm with knowledge on April 11, 1891, that said death had occurred.

All the assignments of error are in effect disposed of by what has been said above.

The decree of the District Court dismissing the bill, with costs, is affirmed, and the appellees recover their costs of appeal.